**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
WHEELING**

**CHARLIE GOFF WAGONER,**

Plaintiff,

**v.**

**CIVIL ACTION NO.: 5:15-CV-134
(STAMP)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

Defendant.

## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On October 19, 2015, Plaintiff Charlie Goff Wagoner ("Plaintiff"), through counsel

Jan Dils, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On December 28, 2015,

the Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 6; Admin. R., ECF No. 7). On January 26, 2016, and February 22, 2016,

Plaintiff and the Commissioner filed their respective Motions for Summary Judgment

and supporting briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for

Summ. J. ("Def.'s Mot."), ECF No. 12). On March 7, 2016, Plaintiff filed a Reply to the

Commissioner's brief. (Pl.'s Reply to Def.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s

Reply"), ECF No. 14). The matter is now before the undersigned United States

Magistrate Judge for a Report and Recommendation to the District Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the undersigned finds that substantial evidence supports the Commissioner's decision and recommends that the Commissioner's decision be affirmed.

## II. PROCEDURAL HISTORY

On April 30, 2012, Plaintiff protectively filed a Title XVI claim for supplemental security income ("SSI") benefits, alleging disability that began on May 1, 2007. (R. 14). Plaintiff's claim was initially denied on September 27, 2012, and denied again upon reconsideration on December 26, 2012. (R. 69, 79). After these denials, Plaintiff filed a written request for a hearing. (R. 86).

On April 9, 2014, a video hearing was held before United States Administrative Law Judge ("ALJ") Jack Penca in Charleston, West Virginia. (R. 14, 25, 29, 96). Nancy Shapero, an impartial vocational expert, appeared and testified in Charleston. (R. 14, 29, 121). Plaintiff, represented by Lindsey Bailey, Esq., of Jan Dils, Attorneys at Law, LC, appeared and testified in Parkersburg, West Virginia. (R. 14, 29). On April 29, 2014, the ALJ issued an unfavorable decision to Plaintiff, finding that he was not disabled within the meaning of the Social Security Act. (R. 11). On August 27, 2015, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

## III. BACKGROUND

### A. Personal History

Plaintiff was born on December 5, 1959, and was fifty-two years old at the time he filed his claim for benefits. (See R. 47). He is 5'7" tall and weighs approximately 150

pounds. (R. 147). He is married and lives with his wife and adult son in a house. (R. 34, 154). He possesses a GED and has received training at a career center for welding, automotive work and building construction. (R. 148). His prior work experience includes working as an "auto mechanic." (R. 44). He alleges that he is unable to work due to the following ailments: (1) neck pain caused by a neck injury; (2) depression; (3) a back injury; (4) dizziness; (5) a shoulder injury; (6) arthritis; (7) hip impairments; (8) high blood pressure; (9) migraine headaches; (10) a bone tumor in his left forearm; (11) lightheadedness and (12) a "light heart attack." (R. 147).

**B. Medical History**

**1. Medical History Pre-Dating Alleged Onset Date of May 1, 2007**

On January 16, 1999, Plaintiff presented to the emergency room at the Minnie Hamilton Health Care Center ("Minnie Hamilton"). (R. 307). Plaintiff stated that he had been involved in a single car accident, in which he "spun out and hit a guardrail," and that he was now experiencing left knee pain. (R. 305, 207). X-rays of Plaintiff's left knee were taken, which were normal. (R. 318).

On January 22, 1999, Plaintiff returned to the emergency room at Minnie Hamilton, complaining of continuing left knee pain and a headache that had started three days prior. (R. 305). X-rays were ordered of Plaintiff's head, which were normal. (R. 317). Therefore, Plaintiff was diagnosed with left knee muscle strain and headaches. ((R. 205). He was prescribed Naprosyn for his pain and provided with an excuse to be off work the next day. (Id.).

## 2. Medical History Post-Dating Alleged Onset Date of May 1, 2007

On August 17, 2007, Plaintiff presented to a Minnie Hamilton clinic, where he received primary care, complaining of a node on his left wrist, neck pain and feeling "kind of dull and depressed." (R. 304). After an examination, X-rays of Plaintiff's left forearm and neck were ordered. (Id.). The X-rays of Plaintiff's forearm were normal. (R. 312). The X-rays of Plaintiff's neck revealed "[d]isc space narrowing at [the] C5-C6 level without any evidence of fracture or acute process." (R. 309). Plaintiff was prescribed Ultram to treat his pain and was provided with samples of Lexapro for his depression. (R. 304).

On August 24, 2007, Plaintiff returned to the clinic for a follow-up appointment. (R. 303). During this appointment, Plaintiff was started on a prescription, instead of samples, of Lexapro. (Id.). An ultrasound of his left forearm was also ordered, which revealed:

> [A m]ass measuring 1.4 x 0.8 x 2.3 cm in the area of interest represents a mostly solid mass with a central cystic area. In light of this finding, soft tissue tumor is not excluded.

(R. 308).

In early September 2007, Plaintiff underwent a radiological work-up. An MRI of Plaintiff's head was ordered due to his complaints of headaches, which showed no abnormalities. (R. 277). An MRI of Plaintiff's cervical spine was also ordered due to his complaints of pain, which showed:

> Moderate degenerative changes are seen with broad but relatively shallow posterior spurs at C3-C4, C5-C6 and C6-C7 and uncovertebral spurring is prominent of the left, greatest at C5-C6. The left C5-C6 neural foramen is narrowed but this does not correlate with [Plaintiff's] right shoulder pain. No direct cord or nerve root compression is seen.

(R. 278). Finally, an MRI of Plaintiff's left wrist was ordered due to the presence of the mass on the ultrasound, which revealed an abnormal soft tissue structure of unknown etiology. (R. 279).

On September 21, 2007, Plaintiff returned to the Minnie Hamilton clinic for a follow-up appointment after his radiological work-up. (R. 302). During this appointment, Plaintiff stated that "he [was] doing fine." (Id.). After an examination, Plaintiff received a physical therapy referral[1] for his chronic neck pain and a prescription of Lortab. (Id.). Plaintiff also received a referral to an orthopedic surgeon for his left wrist mass. (Id.). During a follow-up appointment on October 17, 2007, Plaintiff stated that he was taking his Lortab as prescribed but that he had stopped taking his prescription of Lexapro. (R. 301).

On November 16, 2007, Plaintiff returned to the clinic, complaining of back pain that radiated to his hand. (R. 300). Plaintiff stated that physical therapy worsened his pain. (Id.). Plaintiff further stated that he was seeing an orthopedic surgeon for his left forearm mass.[2] (Id.). After an examination, Plaintiff was referred to a neurosurgeon to treat his radiating pain. (Id.). Plaintiff's prescription of Lortab was also increased. (Id.).

On May 6, 2008, Plaintiff returned to the clinic again for a follow-up appointment. (R. 299). During this appointment, an MRI of Plaintiff's left wrist/forearm was ordered,

---

[1] Plaintiff received his initial physical therapy evaluation on October 29, 2007. (R. 321). During his evaluation, Plaintiff was noted to have a decreased range of motion in his cervical spine and decreased strength in his left arm. (R. 324). Therefore, Plaintiff was ordered to participate in physical therapy two to three times per week for four to six weeks. (Id.). However, his physical therapist later noted that Plaintiff had participated in a total of two sessions before he stopped presenting for his appointments. (R. 319). Due to Plaintiff's failure to appear, Plaintiff was discharged from the program. (Id.).

[2] Plaintiff stated that he was seeing Dr. Smith for his left forearm mass. (R. 300). However, it was subsequently noted that Plaintiff had failed to keep his appointment with Dr. Smith. (R. 299). Therefore, Plaintiff was again referred to Dr. Smith and instructed to keep his appointment. (Id.).

which revealed that "[t]he soft tissue abnormality [was] . . . significantly smaller and less conspicuous[,] making neoplasm unlikely." (R. 281). MRIs of Plaintiff's cervical, thoracic and lumbosacral spines were also ordered. (R. 215, 282-83). The results of the cervical spine MRI showed posterior spurring and increased marrow edema. (R. 282). The results of the thoracic spine MRI were normal. (R. 283). The results of the lumbosacral spine MRI showed some "disc space disease" but were otherwise "[n]ormal lumbar spine films." (R. 215). Subsequently, another MRI of Plaintiff's lumbar spine was ordered, which revealed:

1.  Degenerative changes most pronounced at the lower three levels. There is minimal bulging of the disc at L3-L4 with no canal stenosis.
2.  At the L4-L5 level there is a posterior annular tear with a shallow broad disc protrusion and minimal mass effect on the thecal sac.
3.  At the L5-S1 level there is mild bridging of the disc and a small midline disc protrusion or spur. There is no significant mass effect on the thecal sac.

(R. 242). Based on this MRI, Plaintiff received a referral to a neurosurgeon on August 4, 2010. (R. 210).

On April 14, 2011, Plaintiff presented to the office of Dorai T. Rajan, M.D., to establish as a new patient when switching primary care providers. (R. 257). During this visit, Dr. Rajan examined Plaintiff and noted that Plaintiff suffers from hypertension, chronic shoulder and back pain, hypertension, gastroesophageal reflux disease ("GERD"), high cholesterol, fatigue and a history of atypical chest pain. (R. 259). Dr. Rajan instructed Plaintiff to take ibuprofen and prescribed Lortab for his pain. (Id.). Dr. Rajan also ordered X-rays of Plaintiff's chest and shoulder, which were all normal. (R. 280, 259). Finally, Dr. Rajan referred Plaintiff to Kalapala S. Rao, M.D., for pain management. (R. 259).

Plaintiff returned to Dr. Rajan's office routinely over the following months. On July 14, 2011, Dr. Rajan prescribed lisinopril-hydrochlorothiazide for Plaintiff's hypertension and Zantac for Plaintiff's GERD. (R. 201-02). On October 27, 2011, Dr. Rajan prescribed Zoloft, an antidepressant, after Plaintiff stated that he was feeling depressed because his mother had just suffered a stroke, his sister had stage III throat cancer, his brother had leukemia and his nephew had cancer. (R. 195). On November 3, 2011, Plaintiff informed Dr. Rajan that he was still feeling depressed, although he stated that he did not start taking his Zoloft prescription due to fear of side effects. (See R. 192). Therefore, Dr. Rajan referred Plaintiff to the Worthington Center for mental health services. (Id.). On November 29, 2011, Dr. Rajan noted that Plaintiff was taking Ativan and that, while he was feeling calmer, it was making him "stay awake." (R. 190).

On February 21, 2012, Plaintiff presented to Dr. Rao's office for his pain management consultation. (See R. 349). During this consultation, Plaintiff stated that he still experienced chronic neck pain but that "[s]ome days [were] good." (Id.). Dr. Rao noted that Plaintiff received "some relief [with] rest and [pain] medications." (Id.). Dr. Rao prescribed Vicodin for Plaintiff's pain. (Id.).

Plaintiff returned to Dr. Rao's office routinely over the next several months for follow-up appointments. On March 3, 2012, Plaintiff received trigger point injections in his neck to treat his chronic pain. (Id.). Plaintiff stated that he believed the injections "[were] helping." (Id.). On April 17, 2012, and May 15, 2012, no further trigger point injections were administered, although Dr. Rao noted that Plaintiff remained on Vicodin. (R. 343, 349).

On May 30, 2012, Plaintiff presented to the emergency room at St. Joseph Hospital, stating that he had fallen and was suffering from right knee pain. (R. 346). X-rays of Plaintiff's right knee were ordered, which were normal. (Id.). Subsequently, Plaintiff returned to Dr. Rao's office, complaining of stiffness and soreness after his fall. (R. 343). Dr. Rao diagnosed Plaintiff with acute low back pain and administered trigger point injections to Plaintiff's back. (Id.).

Plaintiff presented to Dr. Rao's office approximately once a month for the rest of 2012. (R. 342-43, 350). On July 10, 2012, Dr. Rao noted that she was treating Plaintiff for chronic low back pain, sprain/strain, chronic neck pain and spondylosis and that she had instructed Plaintiff to, *inter alia*, apply ice and heat as needed for pain and perform home exercises with back/lifting precautions. (See R. 343). On August 7, 2012, Dr. Rao added Lyrica to Plaintiff's pain medication regimen. (R. 342). On September 4, 2012, Plaintiff complained of increased pain in his upper back and Dr. Rao administered trigger point injections to his upper back muscles. (Id.). Dr. Rao also ordered X-rays of Plaintiff's lumbar spine, which revealed "[l]ocalized degenerative changes," including anterior spurring and moderate disc narrowing at the L5-S1 level. (R. 233).

On October 2, 2012, Dr. Rao noted that Plaintiff continued to experience pain in his upper back, between his shoulders, but instructed Plaintiff to continue his current pain medication regimen. (R. 342). On October 30, 2012, Dr. Rao documented that she had performed a straight leg rising test on Plaintiff, which was negative, and that Plaintiff's gait was normal. (R. 350). However, Dr. Rao further documented that, during an examination, Plaintiff experienced tenderness in his cervical and lumbar spinal

muscles and decreased flexion and extension of his spine. (Id.). On December 5, 2012,

Dr. Rao ordered X-rays of Plaintiff's cervical spine, which showed:

1. No evidence of an acute bony injury.
2. Moderate degenerative disc disease at C3-C4 and C5-C6.
3. Moderate bilateral foraminal bony encroachment at C5-C6 related to uncovertebral spurring.

(R. 330, 350).

Plaintiff continued seeking treatment with Dr. Rao in 2013. On January 2, 2013,

and January 30, 2013, Dr. Rao reported that Plaintiff's pain medication was "helping."

(R. 350-51). Dr. Rao reported similar findings on March 15, 2013, and April 12, 2013.

(R. 351). Therefore, no changes were made to Plaintiff's treatment regimen. (See R.

350-51). On May 10, 2013, Plaintiff complained of pain in his right shoulder. (R. 341).

Therefore, Dr. Rao ordered X-rays of Plaintiff's shoulder, which were never obtained

because Plaintiff "lost [his] medical card." (Id.). On June 7, 2013, Dr. Rao administered

trigger point injections to Plaintiff's neck muscles for treatment of his chronic pain. (Id.).

On July 5, 2013, after Plaintiff complained of neck and low back pain, Dr. Rao

prescribed a Medrol Dose Pack. (R. 341). On August 16, 2013, Dr. Rao documented

that Plaintiff was still prescribed a Medrol Dose Pack for his pain. (R. 340). On

September 13, 2013, Dr. Rao reported that Plaintiff's medications were "helping some."

(Id.). On October 2, 2013, after Plaintiff complained of right shoulder pain, Dr. Rao

ordered X-rays of Plaintiff's shoulder, which were normal. (R. 329). On October 11,

2013, Dr. Rao ordered films of Plaintiff's cervical spine, which showed:

1. No evidence of an acute bony injury.
2. Degenerative disc disease at C3-C4 and C5-C6. There is also mild bilateral frontal encroachment at C5-C6.
3. No significant change since 12/30/2012.

(R. 328, 340). On November 8, 2013, Dr. Rao administered trigger point injections in Plaintiff's neck after he complained of feeling "knots" and stiffness in his neck. (R. 352). On December 6, 2013, Dr. Rao changed Plaintiff's pain medications to Norco. (Id.). On January 3, 2014, Dr. Rao noted that Plaintiff had not reported any side effects from his new medication. (Id.).

Dr. Rao continued to treat Plaintiff's chronic pain into 2014. On January 31, 2014, Dr. Rao documented that Plaintiff had been receiving "some relief [from his pain through] rest [and] medications." (R. 339). However, Dr. Rao also documented that Plaintiff was complaining of right knee pain. (Id.). Therefore, Dr. Rao ordered X-rays of Plaintiff's right knee, which were unremarkable. (R. 285, 339).

### 3. Medical Reports/Opinions

#### a. Mental Status Examination by Cynthia Spaulding, M.A., September 10, 2012

On September 10, 2012, Cynthia Spaulding, M.A., a licensed psychologist, performed a Mental Status Examination of Plaintiff. (R. 222-27). Prior to this examination, Ms. Spaulding noted that Plaintiff's chief complaints include clinical depression, chronic pain and short-term memory loss and dizziness caused by a heart attack. (See R. 222).

The Mental Status Examination consisted of a clinical interview and a mental assessment of Plaintiff. (Id.). During the clinical interview, Plaintiff informed Ms. Spaulding that he has been depressed for "a couple years" and that his depression was exacerbated when his mother passed away in 2010. (Id.). He explained that his depression symptoms consist of delayed onset sleep, insomnia, a lack of interest in activities that he previously enjoyed and feeling sad or irritable the majority of the time.

(Id.). Plaintiff also stated that his chronic pain and lack of socialization worsen his depression. (R. 222, 225).

After interviewing Plaintiff, Ms. Spaulding performed a thorough mental assessment of Plaintiff. (See R. 225). When summarizing her findings from this assessment, Ms. Spaulding stated that:

> [Plaintiff] was . . . observed to have restricted affect and psychomotor slowing. . . . [He also experienced] difficulties in attention span and recent memory . . . .

(R. 226). After completing the Mental Status Examination, Ms. Spaulding concluded that Plaintiff suffers from major depression and a cognitive disorder and that his prognosis is guarded. (Id.).

### b. Disability Determination Explanation by Richard L. McCullough, SDM, and Jeff Harlow, Ph.D., September 12, 2012

On or about September 12, 2012, Richard L. McCullough, SDM, and Jeff Harlow, Ph.D., state agency consultants, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 47-56). In the Initial Explanation, the state agency consultants opined that Plaintiff suffers from the following severe impairments: (1) sprains and strains – all types; (2) osteoarthritis and allied disorders; (3) disorders of the back – discogenic and degenerative and (4) affective disorders. (R. 50). Dr. Harlow further opined that Plaintiff suffers from non-severe impairments, including angina pectoris, without ischemic heart disease, and essential hypertension. (Id.).

In the Initial Explanation, Dr. McCullough completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 52-53). During this assessment, Dr. McCullough found that, while Plaintiff possesses no manipulative, visual, communicative or environmental limitations, Plaintiff possesses exertional and postural

limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. McCullough found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 52). Regarding Plaintiff's postural limitations, Dr. McCullough found that Plaintiff is able to frequently balance, stoop and kneel but only occasionally climb ladders/ropes/scaffolds, crouch and crawl. (R. 53). Dr. McCullough further found that Plaintiff is not limited in his ability to climb ramps/stairs. (Id.). After completing the RFC assessment, Dr. McCullough determined that Plaintiff is able to perform light-exertional work. (R. 55).

Also in the Initial Explanation, Dr. Harlow completed a Psychiatric Review Technique ("PRT") form and a Mental RFC Assessment of Plaintiff. (R. 50-51, 53-55). On the PRT form, Dr. Harlow analyzed the degree of Plaintiff's functional limitations. (R. 51). Specifically, Dr. Harlow rated Plaintiff's restriction of his activities of daily living as "[n]one." (Id.). Dr. Harlow further rated Plaintiff's difficulties in maintaining social functioning as "[m]ild" and in maintaining concentration, persistence and pace as "[m]oderate." (Id.). Finally, Dr. Harlow rated Plaintiff's episodes of decompensation as "[n]one." (Id.).

In the Mental RFC Assessment of Plaintiff, Dr. Harlow determined that Plaintiff does not possess any social interaction limitations or adaptation limitations. (R. 54). However, Dr. Harlow further determined that Plaintiff possesses limitations in understanding and memory and sustained concentration and persistence. (R. 53-54). Regarding Plaintiff's limitations in understanding and memory, Dr. Harlow found that

Plaintiff is not significantly limited in his ability to understand and remember very short and simple instructions but is moderately limited in his abilities to remember locations and work-like procedures and to understand and remember detailed instructions. (Id.).

Regarding Plaintiff's limitations sustained concentration and persistence, Dr. Harlow found that Plaintiff is not significantly limited in his abilities to: (1) carry out very short and simple instructions; (2) maintain attention and concentration for extended periods; (3) perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (4) sustain an ordinary routine without special supervision; (5) make simple work-related decisions and (6) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 54). Dr. Harlow further found that Plaintiff is moderately limited in his abilities to carry out detailed instructions and work in coordination with or in proximity to others without being distracted by them. (Id.). After performing the Mental RFC Assessment, Dr. Harlow opined that Plaintiff's mental impairments do not limit him to unskilled work. (R. 55).

### c. Disability Determination Examination by Stephen Nutter, M.D., September 20, 2012

On September 20, 2012, Stephen Nutter, M.D., a state agency physician, performed a Disability Determination Examination of Plaintiff. (R. 228-32). This examination consisted of a clinical interview and a physical examination of Plaintiff. (See id.). During the clinical interview, Plaintiff stated that he has experienced joint pain for nine years and that "[h]e has had problems with his right knee giving out on him," resulting in falls. (R. 228). Plaintiff further stated that he was involved in a motorcycle

accident seven or eight years ago, resulting in chronic neck pain, and that he "[ran] on a job in the oil field and hurt his back" in the 1980s. (Id.). Finally, Plaintiff stated that he has experienced chest pain for five years. (R. 229).

After the clinical interview, Dr. Nutter performed a physical examination of Plaintiff. (R. 229-31). The examination revealed many normal findings. (See id.). However, the examination also revealed several abnormal findings. (See id.). When summarizing those findings, Dr. Nutter stated that:

> [Plaintiff had] pain and tenderness to the right hip and a small nodule there. He, a number of months ago, fell and hurt it and had a hematoma. It might represent the resolving contusion there. . . .
>
> He had pain and tenderness and decreased range of motion in the cervical, dorsolumbar spine. . . . There is definite evidence of nerve root compression.

(R. 232). Ultimately, Dr. Nutter concluded that Plaintiff suffers from arthralgia, a right hip contusion, chronic cervical and lumbar strain and chest pain. (Id.).

### d. Disability Determination Explanation by Fulvio Franyutti, M.D., December 17, 2012

On December 17, 2012, Fulvio Franyutti, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 58-67). In the Reconsideration Explanation, Dr. Franyutti "affirmed as written" all of Dr. McCullough's conclusions contained in the Initial Explanation, including the physical RFC assessment. (R. 64). Likewise, Holly Cloonan, Ph.D., a state agency psychological consultant, "affirmed as written" all of Dr. Harlow's conclusions contained in the Initial Explanation, including the PRT form and the Mental RFC Assessment. (R. 62, 65-66).

### e. General Physical by Jason Fincham, D.O., June 21, 2013

On June 21, 2013, Jason Fincham, D.O., a physician at the Minnie Hamilton clinic, performed a General Physical of Plaintiff. (R. 219-21, 293-95). During the physical, Plaintiff complained of headaches/migraines, feeling "pain from head to toe" and feeling lightheaded. (R. 217). After the examination, Dr. Fincham noted that Plaintiff has been diagnosed with chronic neck and back pain. (R. 294). Dr. Fincham also noted that Plaintiff should avoid lifting as a work condition and that he is not able to perform full-time work. (Id.). Finally, Dr. Fincham noted that Plaintiff needs additional treatment and should seek a consultation from a neurosurgeon. (Id.).

### f. Disability/Incapacity Evaluation by T.J. Janick, M.D., June 26, 2013

On June 26, 2013, Dr. Janick completed a Disability/Incapacity Evaluation of Plaintiff. (R. 235-236). In this evaluation, Dr. Janick opined that Plaintiff possesses a severe impairment or combination of impairments that "meet or equal the listing of impairments." (R. 236). However, Dr. Janick did not specify which listing he believed Plaintiff's impairments met or equaled. (See id.).

### g. Physical RFC Assessment by Kalapala S. Rao, M.D., March 24, 2014

On March 24, 2014, Dr. Rao performed a physical RFC assessment of Plaintiff. (R. 335-38). During this assessment, Dr. Rao found that, while Plaintiff possesses no visual or communicative limitations, Plaintiff possesses exertional, postural, environmental and manipulative limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Rao found that Plaintiff is able to: (1) occasionally lift and/or carry ten to fifteen pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk for

approximately two hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday. (R. 335-36).

Regarding Plaintiff's postural limitations, Dr. Rao found that Plaintiff is able to only occasionally stoop, crouch, kneel and crawl and must never climb or balance. (R. 336). Regarding Plaintiff's environmental limitations, Dr. Rao determined that, while Plaintiff need not avoid chemicals, dust, noise or fumes, he must avoid heights, temperature extreme, humidity and vibrations. (Id.). Regarding Plaintiff's manipulative limitations, Dr. Rao determined that, while Plaintiff is not limited in his ability to feel, he is limited in his abilities to reach in all directions, handle objects and finger objects. (R. 337). More specifically, Dr. Rao determined that Plaintiff is limited to only occasionally reaching, handling objecting and fingering objects. (Id.).

## C.    Testimonial Evidence

During the administrative hearing on April 9, 2014, Plaintiff divulged his personal facts and work history. In 1993 or 1994, Plaintiff was involved in a motorcycle accident and has experienced pain since that time. (R. 42). For several years after the accident, Plaintiff worked as an automobile mechanic.[3] (R. 35). As an automobile mechanic, Plaintiff changed tires and brakes and performed "general maintenance." (Id.). Plaintiff explained that he was not limited to basic mechanics but "could pretty much do anything." (Id.). Plaintiff ceased working as an automobile mechanic when other mechanics at his place of employment quit, which increased his workload to an amount that he could not handle. (R. 41-42).

---

[3] The ALJ noted that, prior to Plaintiff's work as an automobile mechanic, Plaintiff did not work for "significant periods" of time. (R. 41). Plaintiff explained that he had been convicted of a marijuana-related felony in 1997 and, afterwards, experienced difficulty finding work. (R. 41). Plaintiff denies using marijuana since his conviction. (R. 40).

Plaintiff testified that he suffers from lower back pain, neck pain and anxiety. (R. 35-39). Regarding his lower back pain, Plaintiff states that the pain has progressively worsened since his motorcycle accident. (R. 35, 42). Plaintiff describes the pain as a constant throbbing and states that:

> The pain is like muscle spasms going through sharp electrical feelings going through my lower back and down my leg. The bones. That's the most pain in my bones. My skeletal [sic].

(R. 35-36). Plaintiff declares that the pain worsens with activity and can become "unbearable" at times, preventing him from walking or moving. (R. 36). He estimates that he can walk or stand in place for ten minutes before needing to sit for fifteen to twenty minutes. (R. 36-37). He further estimates that he can sit for only thirty minutes before needing to stand and that he can lift only "a few pounds." (Id.).

Regarding his neck pain, Plaintiff states that the pain originates at the base of his neck and radiates down his arms, describing the pain in his right arm as more severe than in his left. (R. 37-38). Plaintiff further describes the pain as "feel[ing] like someone's hitting the top of my head with a hammer." (Id.). In addition to arm pain, he states that he occasionally experiences finger numbness and, as a result, is unable to move his fingers. (Id.).

Regarding his anxiety, Plaintiff states that he routinely feels nervous and anxious, occasionally stemming into paranoia. (R. 38). He declares that these feelings occasionally develop into panic attacks, estimating that the attacks occur two to three times a week. (Id.). During his panic attacks, Plaintiff states that he experiences disorientation, difficulty breathing and feelings of being "[s]mother[ed]." (R. 38-39). He estimates that his panic attacks can last for half an hour or an entire day. (R. 39).

Finally, Plaintiff testified regarding his routine activities. On a typical day, Plaintiff awakens and performs his own personal care. (Id.). He then drinks coffee and takes his medications. (Id.). After he performs his morning tasks, Plaintiff "sit[s] around" and watches the news with his wife. (Id.). At some point during the day, he performs "a bit of housework." (Id.). To illustrate, Plaintiff washes dishes for ten to fifteen minutes and sweeps the living room and kitchen floors. (Id.).

## D.    Vocational Evidence

### 1.  Vocational Testimony

Nancy Shapero, an impartial vocational expert, also testified during the administrative hearing. (R. 43-46). Initially, Ms. Shapero testified regarding the characteristics of Plaintiff's past relevant work. (R. 44). Specifically, Ms. Shapero testified that Plaintiff has worked as an "auto mechanic." (Id.). Ms. Shapero characterized the job as a medium-exertional, skilled position. (See id.).

After Ms. Shapero described Plaintiff's past relevant work, the ALJ presented a hypothetical question for Ms. Shapero's consideration. In this hypothetical, the ALJ asked Ms. Shapero to:

> [C]onsider an individual the claimant's age, education and work history who can perform work at the light exertional level. Who can occasionally climb ramps, stairs, ladders, ropes and scaffolds. Who can occasionally balance, stoop, kneel, crouch and crawl. Who must avoid concentrated exposure to extreme cold, vibration and hazards, such as moving machinery and unprotected heights and who can perform simple, routine and repetitive tasks with no fast pace or strict production requirement and that do not require team work or involve tandem tasks.

(Id.). The ALJ then asked Ms. Shapero whether the hypothetical individual could perform Plaintiff's past work as an auto mechanic, to which Ms. Shapero responded in the negative. (Id.). However, Ms. Shapero further responded that such an individual

could work as a janitor, hand packer or price marker. (R. 45). The ALJ then asked how being off task for twenty percent of a workday would affect an individual's employment, to which Ms. Shapero responded that such an individual would not be employable. (Id.).

Plaintiff's counsel, Ms. Bailey, also presented questions for Ms. Shapero's consideration during the administrative hearing. First, Ms. Bailey asked whether the janitor, hand packer and price marker positions that Ms. Shapero previously identified allowed for a sit/stand option at will. (Id.). Ms. Shapero responded that, while the Dictionary of Occupational Titles ("DOT") does not recognize a sit/stand option, she believed the hand packer and price marker positions would allow for such an option. (Id.). Second, Ms. Bailey asked whether an individual could work as a janitor, hand packer or price marker if he or she "could only occasionally use their hands or upper extremities." (R. 46). Ms. Shapero responded that such an individual could not perform any of the identified job positions. (Id.).

## 2. Disability Reports and Social Summary Outlines

On May 10, 2012, Plaintiff completed a Disability Report. (R. 146-53). In this report, Plaintiff indicated that the following ailments limit his ability to work: (1) neck pain caused by a neck injury; (2) depression; (3) a back injury; (4) dizziness; (5) a shoulder injury; (6) arthritis; (7) hip impairments; (8) high blood pressure; (9) migraine headaches; (10) a bone tumor in his left forearm; (11) lightheadedness and (12) a "light heart attack." (R. 147). He further indicated that he stopped working on August 18, 2002, "[b]ecause of [his] conditions." (Id.). Finally, he indicated that he is prescribed hydrocodone and ranitidine for his impairments. (R. 149).

Jan Dils, Esq., submitted two Disability Report-Appeal forms on Plaintiff's behalf.

(R. 164-74). On November 7, 2012, Ms. Dils reported that:

> Allegations: pain and numbness in neck, arms and hands, pain in both
> shoulders and back, pain in hips and constant popping in and out,
> shooting pain down his legs, arthritis in hands, arms, . . . shoulders, neck
> and back, bone tumor on left forearm, dizziness and lightheadedness,
> minor heart attack, high blood pressure, migraines, and depression[.]
>
> He cannot hunt and fish like he used to. NO recreational activi[ties]. He
> has social anxiety and prefers not to be around people. When he climbs
> the stairs, he experiences pain in legs and feet. He avoids them if he can.
> He has migraines constantly. It makes it hard to concentrate. With the
> numbness in his hands he has difficulty gripping or grasping things. He
> cannot sit for very long without experiencing pain in his shoulders, neck
> and back. He can only take "short" showers due to inability to stand for
> very long. He mostly wears things that he can slip on because the
> numbness in his fingers make it difficult.

(R. 168). On January 9, 2013, Ms. Dils reported that, since December 1, 2012, Plaintiff

had been experiencing an increase in neck pain and depressive symptoms. (R. 171).

Ms. Dils also reported that, due to these changes in Plaintiff's condition, his personal

tasks take longer to complete and he no longer participates in any social or recreational

activities. (R. 173). Finally, Ms. Dils added Lyrica to Plaintiff's list of medications. (R.

174).

On June 17, 2013, Roberta S. Hartshorn, supervised by Darlene Smith,

completed a Social Summary Outline of Plaintiff. (R. 237-40). In this outline, Ms.

Hartshorn noted that Plaintiff has worked for an automobile company, an oil company

and a factory in his lifetime. (R. 238). She further noted that he has training/skills as an

automobile mechanic, construction equipment operator and "oil field-rig hand/well

tender." (R. 237).

**E.      Lifestyle Evidence**

On May 18, 2012, Plaintiff completed an Adult Function Report. (R. 154-61). In this report, Plaintiff states that he is unable to work due to the following impairments: lightheadedness, migraines, dizziness and pain. (R. 154).

Plaintiff discloses that he is limited in some ways but not in others. In several activities, Plaintiff requires no or minimal assistance. For example, Plaintiff is able to perform his own personal care. (R. 155). He also prepares his own meals, which primarily consist of sandwiches and frozen dinners. (R. 156). He is able to pay bills, count change, handle a savings account and use a checkbook/money orders. (R. 157). He is able to follow written and spoken instructions. (R. 159). While he requires accompaniment to leave the house because he is "not able to be by [him]self," he is able to ride as a passenger in a car. (R. 157). He is also able to partake in some social activities, such as talking with his children in person and on the phone, although he states that he "do[esn't] like people." (R. 158-59).

While Plaintiff is able to perform some activities, he describes how others prove more difficult due to his physical and mental impairments. Plaintiff's impairments affect his abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, memorize information, complete tasks, concentrate, use his hands and get along with others. (R. 159). Plaintiff explains that he requires a non-prescription cane to walk and can only walk fifty yards before needing a fifteen- to twenty-minute rest. (R. 159-60). Plaintiff further explains that he is limited to lifting five pounds or less, standing ten to fifteen minutes, sitting for half an hour to an hour, kneeling less than five minutes and paying attention fifteen to twenty minutes. (R. 159). Plaintiff has difficulty getting along with

authority figures and handling stress and changes to his routine. (R. 160). Plaintiff also has difficulty sleeping due to his pain. (R. 155).

Finally, Plaintiff denies that he partakes in any routine activities.[4] (Id.). Plaintiff explains that, while he goes outside twice a week, he does not have any hobbies or interests, go shopping, perform any household chores or go anywhere on a regular basis. (R. 155-58).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> [The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses the following five-step sequential evaluation process to determine whether a claimant is disabled:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical

---

[4] Plaintiff does take medication on a routine basis. On a form entitled "Claimant's Medications," Plaintiff reports that he is prescribed the following medications: (1) NitroQuick for his heart; (2) Bayer Aspirin for his heart; (3) albuterol for his breathing; (4) hydrocodone for the pain in his neck, back, legs, shoulders and lower back and (5) Lyrica for his foot and leg pain. (R. 187). Plaintiff states that the hydrocodone causes constipation and dizziness. (R. 161). In addition to medications, Plaintiff is prescribed eyeglasses. (R. 160).

or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or

she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d

802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the

Commissioner at step five to demonstrate that jobs exist in the national economy that

the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir.

1968). If the claimant is determined to be disabled or not disabled during any of the five

steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.    ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation

process, the ALJ found that:

1.    The claimant has not engaged in substantial gainful activity since April 30, 2012, the application date (20 CFR 416.971 *et seq.*).

23

2.      The claimant has the following severe impairments: degenerative disc disease, anxiety, and major depressive disorder (20 CFR 416.920(c)).

3.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.      After careful consideration of the entire record, I find that the claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except he can occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. The claimant must avoid concentrated exposure to extreme cold, vibration, and hazards such as moving machinery and unprotected heights. He is limited to simple, routine, and repetitive tasks with no fast pace or strict production requirements and no teamwork or tandem tasks.

5.      The claimant is unable to perform any past relevant work (20 CFR 416.965).

6.      The claimant was born on December 5, 1959, and was 52 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.      The claimant has a general equivalency diploma (GED) and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (see SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since April 30, 2012, the date the application was filed (20 CFR 416.920(g)).

(R. 16-24).

# VI.    DISCUSSION

## A.    Contentions of the Parties

In his Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision is contrary to the law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ incorrectly evaluated the medical opinions of Drs. Rao, Franyutti, Janick and Fincham. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 3-5, ECF No. 11). Plaintiff requests that the Court reverse the Commissioner's decision and/or remand the case for further proceedings. (Id. at 11).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's arguments, Defendant contends that the ALJ appropriately evaluated all of the medical opinions of record. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 9, ECF No. 13). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

## B.    Scope of Review

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind

might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.    Analysis of the Administrative Law Judge's Decision**

Plaintiff challenges the ALJ's evaluation of the medical opinions of Drs. Rao, Franyutti, Janick and Fincham. (Pl.'s Br. at 3-5). An ALJ must "weigh and evaluate every medical opinion in the record." Monroe v. Comm'r of Soc. Sec., No. 1:14CV48, 2015 WL 4477712, at *7 (N.D. W. Va. July 22, 2015). When weighing and evaluating these opinions, an ALJ often accords "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the claimant and has a treatment relationship with the claimant. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005). However, this "treating physician rule . . . does not require that the [treating physician's] testimony be given controlling weight." Anderson v. Comm'r, Soc. Sec., 127 F. App'x. 96, 97 (4th Cir. 2005). Therefore, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence," then it should not be accorded controlling weight. Id. Additionally, if a physician's

opinion encroaches on an issue reserved to the Commissioner, including the issue of whether a claimant meets the statutory definition of disability, then the opinion should not be accorded controlling weight. 20 C.F.R. § 416.927(d)(3).

When evaluating medical opinions that are not entitled to controlling weight, an ALJ must consider the factors detailed in 20 C.F.R. § 416.927. Id. at § 416.927(c) These factors include: (1) whether the physician has examined the claimant; (2) the treatment relationship between the physician and the claimant, including the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; (5) whether the physician is a specialist and (6) any other factor that tends to support or contradict the opinion. Id. An ALJ, however, need not explicitly "recount the details of th[e] analysis [of these factors] in the written opinion." Fluharty v. Colvin, No. CV 2:14-25655, 2015 WL 5476145, at *12 (S.D. W. Va. Sept. 17, 2015).

While an ALJ need not explicitly recount his or her analysis of the factors listed in 20 C.F.R. § 416.927, an ALJ must "give 'good reasons' in the [written] decision for the weight ultimately allocated to medical source opinions." Id. (quoting 20 C.F.R. § 416.927). In this regard, Social Security Ruling 96–2p provides that an ALJ's decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). Once an ALJ has determined "the weight to be assigned to a medical opinion[,] [that determination] generally will not be disturbed absent some indication that the ALJ has dredged up 'specious inconsistencies' or has failed to give a sufficient reason for the weight

afforded a particular opinion." <u>Dunn v. Colvin</u>, 607 F. App'x. 264, 267 (4th Cir. 2015) (internal citations omitted).

### 1. Dr. Rao's Opinion

The ALJ accorded "no weight" to the opinion of Dr. Rao contained in the Physical RFC Assessment. (R. 22). Initially, the ALJ noted that Dr. Rao determined that Plaintiff is: (1) able to lift and carry ten to fifteen pounds occasionally and ten pounds frequently; (2) able to stand and walk a total of two hours with interruption every thirty minutes and sit a total of six hours with an interruption every thirty minutes; (3) unable to climb or balance; (4) able to occasionally stoop, crouch, kneel and craw; (5) limited to occasional reaching, handling and fingering and (6) restricted from exposure to heights, temperature extremes, humidity and vibrations. (<u>Id.</u>). Then ALJ then declined to accord the opinion controlling weight, noting that Dr. Rao's opinion is inconsistent with substantial evidence. (<u>See</u> <u>id.</u>). Subsequently, the ALJ reasoned that the opinion was not entitled to any weight because:

> [T]hese opinions . . . are extreme and inconsistent with the treatment notes by Dr. Rao, which reveal the stability of [Plaintiff's] conditions with conservative care consisting of medication and injections.

(<u>Id.</u>).

The undersigned finds that the ALJ properly evaluated Dr. Rao's opinion. The ALJ clearly did not accord Dr. Rao's opinion controlling weight because it was inconsistent with substantial evidence. Plaintiff argues that, after the ALJ determined that Dr. Rao's opinion was not entitled to controlling weight, he rejected the opinion without considering the factors listed in 20 C.F.R. § 416.927 as required. (Pl.'s Br. at 8). The undersigned disagrees. The ALJ was not required to explicitly recount the details of

his analysis of the five factors in his written opinion. Instead, the ALJ was required only to provide good reasons for his decision to accord Dr. Rao's opinion no weight.

Because the ALJ stated that Dr. Rao's opinion was extreme and inconsistent with his own treatment notes, which the ALJ declared showed that Plaintiff's impairments were stable with conservative care, the ALJ provided good reasons for according the opinion no weight. While the ALJ did not identify specifically which of Dr. Rao's treatment records were inconsistent with Dr. Rao's opinion, the inconsistencies are clear from the ALJ's summary of the evidence that he discussed prior to his decision to accord Dr. Rao's opinion no weight. See Parsons v. Astrue, No. CIV.A. 5:07-CV-00784, 2009 WL 688216, at *15 (S.D.W. Va. Mar. 13, 2009) (stating that, although the ALJ did not explicitly identify which treatment records were inconsistent with the treating physician's opinion when according the opinion no weight, "the inconsistencies [were] clear from the ALJ's prior summary of the evidence").[5] For example, the ALJ noted that:

> [Dr. Rao] stated on February 21, 2012, that [Plaintiff] had [a] normal gait. [Plaintiff] reported having neck pain and had tenderness of the cervical spine on examination. However, [Plaintiff] noted he had relief with medication and was prescribed Vicodin. In follow-up on March 20, 2012, [Plaintiff] indicated that trigger point injections were helping his pain. On examination, [Plaintiff] had normal posture and lateral flexion. [Plaintiff] was given an injection and refill of medication . . . .

---

[5] Plaintiff contends that the Court must find the ALJ's treatment of Dr. Rao's opinion erroneous, citing Yoakum v. Comm'r of Soc. Sec., No. 1:14CV74, 2015 WL 1585745 (N.D. W. Va. Apr. 9, 2015), which he states is "directly on point." (Pl.'s Br. at 8-9). In Yoakum, the ALJ decided not to accord a physician's opinion significant weight because the opinion was inconsistent with a state agency physician's opinion, physical therapy records and the physician's own treatment notes. Yoakum, 2015 WL 1585745, at *27. However, the ALJ failed to point to any specific inconsistencies in the record or provide any explanation that would allow review of her reasoning. Id. at *28. Therefore, Yoakum factually differs from the instant case because, in this case, the ALJ detailed the inconsistencies in the summarization of the evidence provided previously in the written opinion.

On February 15, 2013, [Plaintiff] reported to [Dr. Rao] that medication helped his pain and he had no side effects. Dr. Rao noted [Plaintiff] had normal gait and negative straight leg raising testing. [Plaintiff] was prescribed Vicodin . . . .

On November 8, 2013, Dr. Rao noted [Plaintiff] had complain[ed] of neck pain, but reported medication helped. Dr. Rao gave [Plaintiff] a trigger point injection an instructed him to continue home exercises. . . . During a follow-up on January 31, 2014, Dr. Rao indicated [Plaintiff] had tenderness of bilateral lumbar paraspinals with mild spasm. However, [Plaintiff] had normal posture and gait. [Plaintiff] was prescribed Norco . . . .

The treatment notes reflect that [Plaintiff] consistently reported medication helps his neck and back pain. . . .[6]

(R. 19-21). Therefore, the ALJ's decision is sufficiently specific to allow the undersigned to review his reasons for according Dr. Rao's opinion no weight. Accordingly, the undersigned finds that the ALJ's decision to accord no weight to Dr. Rao's opinion is supported by substantial evidence.[7]

## 2. Dr. Franyutti's Opinion

The ALJ accorded "great weight" to the opinion of Dr. Franyutti contained in the Reconsideration Explanation. (R. 23). Initially, the ALJ noted that Dr. Franyutti determined that Plaintiff is able to perform light exertional work.[8] (Id.). Because Dr.

---

[6] Plaintiff argues that the ALJ mischaracterized Dr. Rao's treatment notes by failing to discuss the portions of the notes that document, inter alia, Plaintiff's complaints of pain and stiffness with activity. (Pl.'s Br. at 9-10). However, an ALJ is "not obligated to comment on every piece of evidence presented." Pumphrey v. Comm'r of Soc. Sec., No. 3:14-CV-71, 2015 WL 3868354, at *3 (N.D. W. Va. June 23, 2015). Moreover, the undersigned finds that the ALJ's characterization of Dr. Rao's treatment notes is supported by substantial evidence.

[7] Plaintiff argues that "the ALJ does not have the discretion to completely reject a treating physician opinion, according to SSR 96-2p." (Pl.'s Br. at 10). However, SSR 96-2p only states that, if a treating source's opinion is not entitled to controlling weight, then the ALJ cannot automatically reject the opinion because "[i]t may still be entitled to deference." SSR 96-2p, 1996 WL 374188 at *1 (emphasis added). Moreover, precedent exists for according treating sources' opinions no weight. See, e.g., Parsons, 2009 WL 688216, at *15; McKinney v. Colvin, No. 1:15-CV-90, 2016 WL 1392019, at *8 (N.D.W. Va. Feb. 19, 2016), R&R adopted, No. 1:15CV90, 2016 WL 1367749 (N.D.W. Va. Apr. 6, 2016); Young v. Colvin, No. 3:13-CV-20719, 2014 WL 4546958, at *15 (S.D. W. Va. Sept. 12, 2014).

[8] The ALJ also noted that Dr. Franyutti had determined that Plaintiff is able to frequently

Franyutti is not one of Plaintiff's treating physicians whose opinion can be granted

controlling weight, the ALJ considered the factors listed in 20 C.F.R. § 416.927 and

determined that the opinion should be accorded great weight. The ALJ reasoned that:

> [The opinion] is consistent with the objective findings and [Plaintiff's]
> effective treatment with injections and medications.

(Id.).

The undersigned finds that the ALJ properly evaluated Dr. Franyutti's opinion.

While Plaintiff argues that the ALJ failed to consider the factors listed in 20 C.F.R. §

416.927, the ALJ was not required to explicitly recount the details of his analysis of the

factors in his written opinion. Instead, the ALJ was required only to provide good

reasons for his decision to accord Dr. Franyutti's opinion great weight, which he

supplied. While Plaintiff argues that the ALJ should have explicitly identified the

objective findings that are consistent with Dr. Franyutti's opinion, the ALJ discussed the

findings in his prior summarization of the evidence, as discussed above. See Part

VI.C.1 (summarizing the evidence showing that Plaintiff's treatment with injections and

medications was effective); see also Parsons, 2009 WL 688216, at *15 (stating that,

although the ALJ did not explicitly identify which treatment records were consistent or

inconsistent with the treating physician's opinion when according the opinion no weight,

the consistencies and "inconsistencies [were] clear from the ALJ's prior summary of the

evidence"). Therefore, the ALJ's decision is sufficiently specific to allow the undersigned

to review his reasons for according Dr. Franyutti's opinion great weight. Accordingly, the

---

balance, stoop and kneel and occasionally crouch, crawl and climb ladders, ropes and
scaffolds. (R. 23). However, the ALJ did not credit this portion of Dr. Franyutti's opinion,
reasoning that "the record is supportive of . . . additional postural and environmental limitations."
(Id.). Plaintiff does not appear to contest the ALJ's treatment of this portion of Dr. Franyutti's
opinion.

undersigned finds that the ALJ's decision to accord great weight to Dr. Franyutti's opinion is supported by substantial evidence.

### 3. Dr. Janick's Opinion

The ALJ accorded "no weight" to the opinion of Dr. Janick contained in the Disability/Incapacity Evaluation. (R. 22). Initially, the ALJ noted that Dr. Janick determined that "[Plaintiff's] impairments met or equaled the listing of impairments." (Id.). Because Dr. Janick is not one of Plaintiff's treating physicians whose opinion can be granted controlling weight, the ALJ considered the factors listed in 20 C.F.R. § 416.927 and determined that the opinion should be accorded no weight. (See id.). The ALJ reasoned that:

> [The opinion] is not supported by objective findings. In fact, Dr. Janick does not even refer to a [specific] listing [that Plaintiff] would meet or equal. Additionally, there is no evidence supportive of finding that [Plaintiff] has physical or mental impairments that meet or equal a listing.

(Id.).

The undersigned finds that the ALJ properly evaluated Dr. Janick's opinion. While Plaintiff argues that the ALJ failed to consider the factors listed in 20 C.F.R. § 416.927, the ALJ was not required to explicitly recount the details of his analysis of the factors in his written opinion. Instead, the ALJ was required only to provide good reasons for his decision to accord Dr. Janick's opinion no weight, which he supplied. While Plaintiff argues that the ALJ should have explicitly identified the objective findings that contradict Dr. Janick's opinion, the ALJ discussed the objective findings in his prior summarization of the evidence. See Parsons, 2009 WL 688216, at *15 (stating that, although the ALJ did not explicitly identify which treatment records were inconsistent with the treating physician's opinion when according the opinion no weight, "the

inconsistencies [were] clear from the ALJ's prior summary of the evidence"). For example, the ALJ stated, *inter alia, that*:

> The x-rays of [Plaintiff's] lumbar spine performed on June 7, 2010, showed impression of disc space disease at L5-S1, but were otherwise normal. On July 15, 2010, an MRI report of [Plaintiff's] lumbar spine showed impressions of degenerative changes most pronounced at the lower three levels; minimal bulging of the disc at L3-L4 with no canal stenosis; posterior annular tear with a shallow broad disc protrusion and minimal mass effect on the thecal sac at L4-L5; and mild bridging of the disc and a small midline disc protrusion or spur at the L5-S1 level with no significant mass effect on the thecal sac. . . .
>
> The x-rays of [Plaintiff's] cervical spine performed on December 30, 2012, showed impressions of moderate degenerative disc disease at C3-C4 and C5-C6 and moderate bilateral foraminal bony encroachment at C5-C6 related to uncovertebral spurring. . . .
>
> Although [Plaintiff] has some objective findings of degenerative disc disease on MRI, the testing reveals they are not at the severity as to support the rather extreme limitations alleged.

(R. 19-20) (internal quotations omitted). Moreover, the undersigned notes that Plaintiff does not contest the ALJ's determination at step three of the sequential evaluation process that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Therefore, the ALJ's decision is sufficiently specific to allow the undersigned to review his reasons for according Dr. Janick's opinion no weight. Accordingly, the undersigned finds that the ALJ's decision to accord no weight to Dr. Janick's opinion is supported by substantial evidence.

### 4. Dr. Fincham's Opinion

The ALJ accorded "no weight" to the opinion of Dr. Fincham contained in the General Physical. (R. 22). Initially, the ALJ noted that Dr. Fincham determined that Plaintiff: (1) must avoid lifting; (2) is unable to stand or ambulate for eight hours a day

and (3) is unable to perform full-time work. (Id.). Because Dr. Fincham is not one of Plaintiff's treating physicians whose opinion can be granted controlling weight, the ALJ considered the factors listed in 20 C.F.R. § 416.927 and determined that the opinion should be accorded no weight. (See id.). Specifically, the ALJ reasoned that the opinion was not entitled to any weight because:

> [The] treatment notes by Dr. Fincham are inconsistent with [the] severity of the limitations he notes [in his opinion. The opinion is also] inconsistent with . . . treatment notes [that] indicate [that Plaintiff's] medical care is effective.

(Id.).

The undersigned finds that the ALJ properly evaluated Dr. Fincham's opinion. Plaintiff argues that the ALJ failed to consider the factors listed in 20 C.F.R. § 416.927 when considering Dr. Fincham's opinion. (Pl.'s Br. at 8-9). However, the ALJ was not required to explicitly recount the details of his analysis of the factors in his written opinion. Instead, the ALJ was required only to provide good reasons for his decision to accord Dr. Fincham's opinion no weight.

Because the ALJ stated that Dr. Fincham's opinion was inconsistent with his own treatment notes, the ALJ provided good reasons for according the opinion no weight. While the ALJ did not identify specifically which of Dr. Fincham's treatment records were inconsistent with the opinion, the inconsistencies are clear from the ALJ's previous summarization of the evidence. See Parsons, 2009 WL 688216, at *15 (stating that, although the ALJ did not explicitly identify which treatment records were inconsistent with the treating physician's opinion when according the opinion no weight, "the inconsistencies [were] clear from the ALJ's prior summary of the evidence"). For example, the ALJ noted that:

[O]n June 21, 2013, [Dr. Fincham], at Minnie Hamilton Health System[,] indicated [Plaintiff] presented with complaint of chronic back and neck pain. However, on examination [Plaintiff] was negative for bone/joint symptoms and muscle weakness. Dr. Fincham noted [Plaintiff] had cervical and lumbar tenderness, but inspection revealed no abnormality. In fact, Dr. Fincham stated [Plaintiff] had normal musculature, no joint deformities or abnormalities, and normal range of motion for all four extremities. [Plaintiff] was prescribed Hydrocodone and Flexeril. . . .

The treatment notes reflect that [Plaintiff] consistently reported [that] medication helps his neck and back pain[, including Dr. Rao's treatment notes that show] . . . the stability of [Plaintiff's] conditions with conservative care consisting of medication and injections.

(R. 20-22) (internal citations omitted). Therefore, the ALJ's decision is sufficiently specific to allow the undersigned to review his reasons for according Dr. Fincham's opinion no weight. Accordingly, the undersigned finds that the ALJ's decision to accord no weight to Dr. Fincham's opinion is supported by substantial evidence.

## VII.   <u>RECOMMENDATION</u>

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's applications for SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 12) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., Senior United States District Judge.

Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984), <u>cert. denied</u>, 467 U.S. 1208 (1984); <u>Wright v. Collins</u>, 766 F.2d 841, 845-48 (4th Cir. 1985); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 1st day of December, 2016.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE